UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Number: |
| | : | |
| | : | VIOLATION: |
| | : | |
| | : | Count One: |
| | : | 18 U.S.C. § 371 |
| v. | : | (Conspiracy) |
| | : | |
| MICHAEL P. S. SCANLON, | : | |
| | : | |
| Defendant. | : | |

INFORMATION

The United States charges that:

### COUNT ONE
### 18 U.S.C. § 371 - Conspiracy

GENERAL ALLEGATIONS:

1. From in or about March 2000 through in or about 2001, Defendant Michael P.S. Scanlon ("SCANLON") was employed by two different national law firms in Washington, D.C., at which he worked with a lobbyist who sought and represented clients for lobbying services throughout the United States and overseas ("Lobbyist A").

2. In or about January 2001, SCANLON established a business called Capital Campaign Strategies LLC which had its principal offices in Washington, D.C. Capital Campaign Strategies LLC was purportedly formed to provide grass roots work, public relations services, and election campaign support. Scanlon also formed other companies that were used primarily to receive money for the services and work performed by others (collectively referred to as "CCS").

3. At all relevant times, Lobbyist A solicited and obtained business with groups and businesses operating and interested in operating gambling casinos throughout the United States, including Native American Indian governments.

## THE CONSPIRACY AND ITS OBJECTS

4. Beginning in at least January 2000 through in or about at least April 2004, in the District of Columbia and elsewhere, the defendant,

**MICHAEL P. S. SCANLON**,

did knowingly conspire, confederate and agree with Lobbyist A and with other persons known and unknown to the United States to commit offenses against the United States; that is to:

(1) corruptly offer and provide things of value, including money, meals, trips and entertainment to federal public officials in return for agreements to perform officials acts benefitting SCANLON, Lobbyist A, and their clients, in violation of 18 U.S.C. § 201(b);

(2) devise a scheme and artifice to defraud the clients of SCANLON and Lobbyist A of money and property through materially false and fraudulent misrepresentations, in violation of 18 U.S.C. §§ 1341 and 1343; and

(3) devise a scheme and artifice to defraud and deprive Lobbyist A's clients of their right to Lobbyist A's honest services, performed free from deceit, fraud, concealment, conflict of interest, and self-dealing, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.

## PURPOSE OF THE CONSPIRACY

5. It was a purpose of the conspiracy for SCANLON and Lobbyist A to enrich themselves by obtaining substantial funds from their clients through fraud and concealment and through obtaining benefits for their clients through corrupt means.

**MANNER AND MEANS**

6. The conspiracy was carried out through the following manner and means:

A. Lobbyist A would persuade clients that they needed to hire CCS exclusively to perform certain grass roots and public relations services to accomplish the goals that Lobbyist A identified for them.

B. To obtain lucrative contracts, SCANLON and Lobbyist A would also make representations to clients about work to be performed that was not in fact what they did or intended to do.

C. SCANLON, through CCS, would charge Lobbyist A's clients prices that incorporated huge profit margins.

D. SCANLON, through CCS, would then kick-back to Lobbyist A fifty-percent of CCS's net profits from Lobbyist A's clients through payments to a variety of entities owned and controlled by Lobbyist A, and SCANLON and Lobbyist A would conceal these kickbacks from their clients.

E. SCANLON and Lobbyist A would falsely represent to their clients that certain of the funds requested were being used for specific purposes, when in fact, SCANLON and Lobbyist A would use those funds for their own personal benefit and not for the benefit of their clients.

F. SCANLON and Lobbyist A would offer and provide things of value to federal public officials, including trips, campaign contributions, meals and entertainment in exchange for agreements that the public officials would use their official positions and influence to benefit SCANLON's and Lobbyist A's clients and Lobbyist A's businesses.

## OVERT ACTS

7. In furtherance of the conspiracy and to achieve its purposes, SCANLON and Lobbyist A committed the following overt acts, among others, in the District of Columbia and elsewhere:

**Fraud Scheme**

<u>Mississippi Tribe</u>

8. In or about 1995, Lobbyist A solicited a Native American Indian tribal client based in Mississippi ("Mississippi Tribe") to hire him to provide lobbying services on various issues, including taxation of the tribe by the Federal government as well as other issues relating to Tribal sovereignty, and the Mississippi Tribe hired Lobbyist A. As SCANLON well knew and believed, Lobbyist A used his knowledge of lobbying and grass roots work, which was superior to the Mississippi Tribe's knowledge of these areas, to secure the trust and confidence of the Mississippi Tribe.

9. In or about early 2001, Lobbyist A recommended and advised the Mississippi Tribe to hire SCANLON'S company, CCS, while concealing the fact that Lobbyist A would receive fifty percent of the profits from the Mississippi Tribe's payments to SCANLON.

10. From in or about June 2001 until in or about April 2004, SCANLON, through CCS, sought and received from the Mississippi Tribe approximately $14,765,000, all the while concealing from the Mississippi Tribe that fifty-percent of the profit, approximately $6,365,000, was kicked-back to Lobbyist A pursuant to their secret arrangement.

Louisiana Tribe

11. In or about March 2001, Lobbyist A and SCANLON solicited a Native American Indian tribal client based in Louisiana ("Louisiana Tribe") to hire them to provide lobbying and grass roots services to the tribe. As SCANLON well knew and believed, Lobbyist A used his knowledge of lobbying and grass roots work, which was superior to the Louisiana Tribe's knowledge of these areas, to secure the trust and confidence of the Louisiana Tribe.

12. In or about March 2001, after SCANLON had been paid for the first project, Lobbyist A recommended and advised the Louisiana Tribe to rehire SCANLON's company, CCS, while concealing the fact that Lobbyist A would receive fifty percent of the profits from the Tribe's payments to SCANLON.

13. From in or about March 2001 to in or about May 2003, SCANLON sought and received approximately $30,510,000, through CCS, all the while concealing from the Louisiana Tribe that fifty-percent of the profit, approximately $10,944,000, including money that was not passed through CCS, was kicked-back to Lobbyist A pursuant to their secret arrangement.

Michigan Tribe

14. In or about January 2002, Lobbyist A and SCANLON solicited a Native American Indian tribal client based in Michigan ("Michigan Tribe") to hire them to provide lobbying and grass roots services to the tribe. As SCANLON well knew and believed, Lobbyist A used his knowledge of lobbying and grass roots work, which was superior to the Michigan Tribe's knowledge of these areas, to secure the trust and confidence of the Michigan Tribe.

15. In or about June 2002, Lobbyist A recommended and advised the Michigan Tribe to expand its contract with SCANLON's company, CCS, while concealing the fact that Lobbyist A would receive fifty percent of the profits from the Michigan Tribe's payments to SCANLON.

16. From in or about June 2002 to in or about October 2003, SCANLON sought and received approximately $3,500,000, through CCS, all the while concealing from the Michigan Tribe that fifty-percent of the profit, approximately $540,000, was kicked-back to Lobbyist A pursuant to their secret arrangement.

Texas Tribe

17. In or about January 2002, Lobbyist A and SCANLON solicited a Native American Indian tribal client based in Texas ("Texas Tribe") to hire them to provide lobbying and grass roots services to the tribe. Lobbyist A misrepresented to the Texas Tribe that he would work for free in anticipation of receiving a long-term lucrative contract in the future. As SCANLON well knew and believed, Lobbyist A's representation that he would work for free was false because SCANLON intended to pay and did pay the fifty-percent kickback due Lobbyist A under the secret arrangement Lobbyist A had with SCANLON.

18. In or about March 2002, SCANLON sought and received approximately $4,200,000, through CCS, all the while concealing from the Texas Tribe that fifty-percent of the profit, approximately $1,850,000, was kicked-back to Lobbyist A pursuant to their secret arrangement.

**Corruption Scheme**

19. From in or about January 2000 through in or about April 2004, SCANLON and Lobbyist A, together and separately, provided a stream of things of value to Representative #1 and members of his staff, including but not limited to a lavish trip to Scotland to play golf on world-famous courses, tickets to sporting events and other entertainment, regular meals at Lobbyist A's upscale restaurant, and campaign contributions for Representative #1, his political action committee, and other political committees on behalf of Representative #1.

20. From in or about January 2000 through in or about April 2004, SCANLON and Lobbyist A, together and separately, sought and received Representative #1's agreement to perform a series of official acts, including but not limited to, agreements to support and pass legislation, agreements to place statements into the Congressional Record, meetings with Lobbyist A and SCANLON's clients, and advancing the application of a client of Lobbyist A for a license to install wireless telephone infrastructure in the House of Representatives.

All in violation of Title 18, United States Code, Section 371.

NOEL L. HILLMAN
Chief, Public Integrity Section


_____          Date:_____
Mary K. Butler
M. Kendall Day
Trial Attorneys


PAUL E. PELLETIER
Acting Chief, Fraud Section


_____          Date:_____
Guy D. Singer
Nathaniel B. Edmonds
Trial Attorneys