CR 05-411

FILED

NOV 21 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ATTACHMENT A

FACTUAL BASIS FOR THE PLEA
OF MICHAEL P. S. SCANLON

This statement is submitted to provide a factual basis for my plea of guilty to the conspiracy charge filed against me.

1. From March 2000 through 2001, Scanlon worked for two different law firms in Washington, D.C. as a public relations specialist engaged in providing public relations services to clients throughout the United States. At these firms, Scanlon worked on many matters, often together with, and at the direction of, a particular lobbyist ("Lobbyist A"). Lobbyist A was influential in Scanlon being hired by both firms.

2. From 2001 through at least March 2004, Scanlon formed and operated a business called Capitol Campaign Strategies LLC. Scanlon marketed Capital Campaign Strategies as a grass roots and public relations firm that provided services throughout the United States. Scanlon also formed and operated firms called American International Center LLC, Atlantic Research Analysis and Scanlon Gould Public Affairs, which were used largely to receive funds in the performance of the business activities of Capital Campaign Strategies LLC (collectively "CCS"). In marketing efforts, Scanlon represented that CCS could organize direct mail and telephone campaigns that would urge public officials to support issues important to CCS's clients. Scanlon also represented that CCS provided election-campaign related services. Scanlon further represented that CCS could provide effective advice about strategies focusing on specific public officials in order to obtain official support for, or neutralize opposition to, the interests of CCS's clients. Typically, Scanlon

12

communicated with Lobbyist A and CCS's clients by interstate electronic mail, interstate telephone calls, and commercial interstate mail carriers. The services that CCS provided frequently involved use of interstate mail and telephone calls. Payments were often made by interstate wire transfer or checks involving interstate funds transfers.

3. Beginning in at least 2000, Scanlon knew that Lobbyist A owned, operated, and sought to purchase interests in various for-profit and not-for-profit businesses in the Washington, D.C. area, Florida, and elsewhere.

Corruption of Public Officials

4. Beginning at least as early as January 2000, Scanlon and Lobbyist A engaged in a course of conduct through which one or both of them offered and provided a stream of things of value to public officials in exchange for a series of official acts and influence and agreements to provide official action and influence. These things of value included, but are not limited to, travel, golf fees, frequent meals, entertainment, election support for candidates for government office, employment for officials and relatives of officials, and campaign contributions. As one part of this course of conduct, things of value were offered to and given to a Member of the United States Congress ("Representative #1") and members of Representative #1's staff, including, but not limited to:

   a. All-expenses-paid trips, including a trip to the Commonwealth of the Northern Marianas Islands ("CNMI") in 2000, a trip to the Super Bowl in Tampa, Florida in 2001, and a golf trip to Scotland in 2002;

13

  b. Numerous tickets for entertainment, including concerts and sporting events in the Washington, D.C. area;

  c. Fundraising events, including providing box suites and food at various sport and concert venues and at a restaurant in the Washington, D.C. area owned by Lobbyist A;

  d. Campaign contributions to campaign committees and to political action committees and organizations, including, but not limited to, the following:

    i. $4,000 in contributions to Representative #1's campaign committee in 2000 with Scanlon's participation and assistance; and

    ii. A $10,000 contribution to the National Republican Campaign Committee ("NRCC") in 2000 at Representative #1's request and with Scanlon's assistance;

  e. Regular meals and drinks at an upscale restaurant owned by Lobbyist A in Washington, D.C.; and

  f. Frequent golf and related expenses at courses in the Washington, D.C area.

5. As part of this course of conduct, one or both of them provided things of value to public officials in exchange for a series of official acts and influence, and agreements to provide official acts and influence, including, but not limited to, agreements to support and pass legislation, agreements to place statements in the <u>Congressional Record</u>, agreements to contact personnel in United States Executive Branch agencies and offices to influence decisions of those agencies and offices, meetings with Lobbyist A and CCS's clients, and

14

awarding contracts for services with CCS and Lobbyist A's law firms. As one part of this course of conduct, Representative #1 and members of his staff agreed to use and did use their official positions and influence, including, but not limited to, the following:

a. Travel by a senior staff member of Representative #1 with others in January 2000 to CNMI for the purpose of assisting Lobbyist A, his firm, and others in obtaining and maintaining lobbying clients;

b. Representative #1's agreement in March 2000 with Scanlon to place a statement drafted by Scanlon into the <u>Congressional Record</u> that was critical of the then-owner of a Florida gaming company, and was calculated to pressure the then-owner to sell on terms favorable to Lobbyist A and his partners;

c. Representative #1's agreement in October 2000 with Scanlon to insert a statement into the <u>Congressional Record</u> which praised the new managers of the Florida gaming company, Lobbyist A's business partners;

d. Representative #1's agreement in approximately August 2001 to use his position as Chairman of a Committee of the House to endorse and support a client of Lobbyist A as the provider of wireless telephone infrastructure to the House of Representatives;

e. Representative #1's agreement in approximately March 2002 that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an existing federal

15

        ban against commercial gaming by a client of Lobbyist A and CCS in Texas ("Texas Tribe");

f.    Representative #1's agreement in approximately June 2002 that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an existing federal ban against commercial gaming for another Native American Tribe in Texas at Lobbyist A's request;

g.    Representative #1 met in August 2002 with representatives of the Texas Tribe to assure them that they were effectively represented by Lobbyist A and that he continued to agree to work to pass the legislation they wanted;

h.    Representative #1's agreement in December 2002 to seek support from a Member of another Committee of the House of Representatives for passage of legislation to lift the federal gaming ban for the Texas Tribe;

i.    Representative #1 met in 2002 with a Native American Tribal client of CCS and Lobbyist A from California ("California Tribe") to discuss Representative #1's agreement to assist in passing legislation regarding taxation of certain payments received by members of the California Tribe, and to assist in an issue relating to a post office of interest to the California Tribe; and

j.    Representative #1 at various times contacted public officials at additional government agencies and offices on behalf of clients of Lobbyist A and CCS in an effort to influence decisions and actions by those officials.

16

Defrauding Clients By Failing to Disclose Financial Interests:

6. Scanlon knew that Lobbyist A had been hired by at least four clients with gaming operations to provide professional services to develop programs to limit market competition or to assist in opening casinos that were vital to the profitability of their clients. In or about 2001, Lobbyist A and Scanlon agreed that Lobbyist A would identify the need for, and direct and encourage his existing clients to obtain, grass roots and public relations services as a critical part of the lobbying program and strategy that Lobbyist A had been hired to provide. Lobbyist A promoted and recommended CCS primarily to provide this grass roots and public relations work, and CCS would make payments to Lobbyist A for his personal benefit. Scanlon knew that Lobbyist A promoted himself as having knowledge superior to his clients regarding lobbying and grass roots activity and Lobbyist A encouraged his clients to trust his judgement in these matters. Scanlon believed that Lobbyist A had a duty to act in the best interest of his clients in these matters. Scanlon believed that Lobbyist A's clients did in fact trust and rely upon Lobbyist A. With respect to one of the clients, Scanlon and Lobbyist A together solicited the business of a Native American Indian Tribe to provide services designed to re-open the tribe's gaming operations. Lobbyist A represented to the client that Lobbyist A would represent the tribe "pro bono" for this assistance in lifting the gaming ban on Class II gaming. In fact, Scanlon and Lobbyist A knew and agreed that as with each of the four clients, Lobbyist A would receive approximately fifty percent of the net profits received by CCS pursuant to the contracts that Scanlon and Lobbyist A promoted to the clients. Most of the payments from clients under the contracts with CCS were made to CCS. Then Scanlon paid Lobbyist A his share of the net profits to various companies and

        organizations that Lobbyist A owned or controlled as Lobbyist A directed. The prices CCS charged for its services were significantly in excess of CCS's costs.

7.   Scanlon and Lobbyist A understood that at no time would the payments to Lobbyist A be disclosed to Lobbyist A's four clients. Both understood that the payments from CCS to Lobbyist A must be kept secret from the clients to obtain and maintain the business for CCS and to maximize profits. They further understood that disclosure of the profit-sharing arrangement to the clients would likely jeopardize the contracts for services of both Lobbyist A's law firm and CCS because the clients were being discouraged by their professional advisor (Lobbyist A) from seeking competitive pricing and proposals from grass roots and public relations vendors other than CCS.

8.   Regarding these four clients of CCS, Lobbyist A received payments of net profits estimated to be $19,698,644.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the conspiracy charge against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged or that others engaged in without my knowledge at the time of my participation. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

DATE: 11/11/05

Michael P.S. Scanlon
Defendant

Stephen Braga
Attorney for Defendant

Plato Cacheris
Attorney for Defendant